UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Robert Hooper,<br><br>                    Plaintiff,<br><br>          -against-<br><br>The City of New York, Sergeant John Mejia, Detective Louis D'Ambrosio, Arthur Noeldechen, Detective Keith Knight, Detective Christopher Vanweddinger, Detective Robert Reed, and Detective Jeffrey Smith, Individually and as Members of the New York City Police Department,<br><br>                    Defendants. | **AMENDED COMPLAINT**<br><br>Index No. 24-cv-6311<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Robert Hooper ("Plaintiff" or "Hooper"), by his attorneys, the Law Offices of

Joel B. Rudin, P.C., respectfully alleges, upon information and belief, as follows:

## NATURE OF ACTION

1.      This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, seeking monetary

damages for Plaintiff Robert Hooper because he spent six years wrongfully incarcerated based

upon drug charges that a team of New York City narcotics officers fabricated.

2.      Plaintiff's damages also resulted from the failure of these police officers, in

violation of their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose numerous

lawsuits and civilian complaints in which they had been accused of false arrest, excessive force,

fabricating evidence, and other constitutional violations.  This information would have enabled

Plaintiff's defense lawyer to impeach the officers' credibility and likely would have produced a

more favorable outcome to Plaintiff's criminal case.

3.      A New York State Supreme Court Justice overturned Plaintiff's conviction on the basis that undisclosed civil lawsuit information and substantiated CCRB findings had been wrongfully withheld from the defense.  By this time, Plaintiff had endured the trauma of his prosecution, six years in state custody, and another four months on strict parole supervision, and had suffered additional consequential damages.

4.      The City of New York is liable to Plaintiff for the damages caused by the *Brady* violations because these violations foreseeably resulted from the unlawful or deliberately indifferent policies, customs, and practices of the New York City Police Department ("NYPD").

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

5.      This action arises under 42 U.S.C. §§ 1983 and 1988.

6.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as the events giving rise to the claim occurred in Manhattan.

8.      This action is timely because it was commenced within three years of the time that Hooper's federal causes of action accrued.

9.      Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

10.      Plaintiff, Robert Hooper, is a citizen and resident of the State of New York and the United States.  He resides within the Southern District of New York.

11.      Defendant City of New York ("City"), of which New York County is a subdivision, is a municipal corporation of the State of New York and is a resident of the

Southern District of New York.  The NYPD is an agency of the City, which is responsible for torts committed by its policymakers and employees.

12.    Defendant John Mejia ("Mejia") was at all relevant times a narcotics detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

13.    Defendant Louis D'Ambrosio ("D'Ambrosio") was at all relevant times a narcotics detective employed by the NYPD, acting within the scope of his authority and under color of State law.  He is named here in his individual and official capacities.

14.    Defendant Arthur Noeldechen, referred to herein as Undercover Officer Number 313 ("UC 313"), was at all relevant times an undercover narcotics officer employed by the NYPD, acting within the scope of his authority and under color of State law.  He is named here in his individual and official capacities.

15.    Defendant Keith Knight ("Knight") was at all relevant times a narcotics detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

16.    Defendant Christopher Vanweddinger ("Vanweddinger") was at all relevant times a narcotics detective employed by the NYPD, acting within the scope of his authority and under color of State law.  He is named here in his individual and official capacities.

17.    Defendant Robert Reed ("Reed") was at all relevant times a narcotics detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

18.     Defendant Jeffrey Smith ("Smith") was at all relevant times a narcotics detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

19.     Defendants Mejia, D'Ambrosio, UC 313, Knight, Vanweddinger, Reed, and Smith will be referred to herein as "the individual defendants."

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Fabricated Allegations

20.     On February 25, 2015, Plaintiff Robert Hooper left his building on 129th Street between 7th and 8th Avenue and started walking down 8th Avenue.

21.     Hooper was 51 years old at the time of this incident.

22.     He was employed as a porter at 310 West 115th Street.

23.     Hooper passed an individual he knew from the neighborhood, Michael Sanicola, as Hooper walked down 8th Avenue.

24.     Hooper and Sanicola greeted each other.

25.     While Hooper was walking on 126th Street between St. Nicholas Avenue and Morningside Avenue, Sergeant Mejia approached Hooper and told him to "freeze" and "come with me."

26.     Hooper stopped walking and put his hands up.

27.     Mejia grabbed Hooper and kneed him repeatedly in the side of the leg, evidently to provoke him.

28.     Nervous about his safety as he was out of view of other people, Hooper broke away from Mejia to get to a more populous area.

29.     Hooper stopped when he reached 125th Street and Morningside Avenue.

30.     Mejia handcuffed Hooper and tried to throw him to the ground.

31.     Vanweddinger and other officers searched Hooper.

32.     The officers found just $91 on Hooper.

33.     Hooper had recently taken that money out of an ATM using his welfare card.

34.     The officers later claimed that they found 31 bags of heroin floating in a sewer that Hooper had passed.

35.     The officers placed Hooper in the back of the prisoner van, where he noticed a ripped up $100 bill at his feet.  The $100 bill did not belong to Hooper.

36.     Vanweddinger told D'Ambrosio, falsely, that he saw Hooper tear up the $100 bill.

37.     To support Hooper's arrest, Mejia, D'Ambrosio, UC 313, and the other individual defendants manufactured a series of false accusations against him: that he had sold Sanicola a bag of heroin, punched Mejia in the face, thrown 31 glassines of heroin in a sewer, and torn up a $100 bill in the back of the police van.

38.     Mejia, D'Ambrosio, UC 313, and the other individual defendants caused various police records to be created to document this false story.

39.     They did so knowing and intending that these records would be transmitted to the Office of the Special Narcotics Prosecutor and would be relied on by prosecutors there to formulate and pursue criminal charges against Hooper.

40.     UC 313 wrote a complaint follow-up form, or DD5, falsely claiming that Hooper gave Sanicola a small object.

41.     D'Ambrosio created an arrest report falsely claiming that Hooper sold heroin, punched Mejia in the face multiple times and flailed his arms in an attempt not to be handcuffed, and attempted to conceal or destroy evidence by throwing heroin down a sewer grate.

42.    D'Ambrosio created a property clerk invoice falsely claiming that Hooper tore a $100 bill.

43.    D'Ambrosio created a property clerk invoice falsely claiming that Hooper threw the 31 glassines of heroin allegedly found in a sewer.

44.    Mejia approved the arrest report and the property clerk invoices knowing they were false.

45.    D'Ambrosio swore to an affidavit for a warrant to search Hooper's cell phone that contained the false version of events.

46.    Under penalty of perjury, D'Ambrosio signed a Criminal Court complaint falsely accusing Hooper of criminal possession of a controlled substance in the third degree, criminal sale of a controlled substance in the third degree, tampering with physical evidence, and resisting arrest.

47.    D'Ambrosio said in this criminal complaint that the criminal sale allegation was based upon what he had been told by UC 313 and that the criminal possession, tampering with physical evidence, and resisting arrest allegations were based upon what he had been told by Mejia.

**Pre-Trial Proceedings**

48.    Hooper was arraigned in the Manhattan Criminal Court on the charges of third-degree criminal sale of a controlled substance, third-degree criminal possession of a controlled substance, tampering with physical evidence, and resisting arrest.

49.    Due to the false allegations of the police, the judge set a high bail that Hooper could not afford and remanded him to jail.

6

50.    Hooper was in custody from the date of his arrest until he was paroled on August 8, 2022, nearly 7 ½ years later.

51.    On or about April 20, 2015, based upon the "evidence" that the Defendants had fabricated, Hooper was indicted for third-degree criminal sale of a controlled substance, N.Y. Penal Law 220.39(1), third-degree criminal possession of a controlled substance, N.Y. Penal Law 220.16(1), tampering with physical evidence, N.Y. Penal Law 215.40(2), and resisting arrest, N.Y. Penal Law 205.30.

52.    UC 313, Mejia, and D'Ambrosio testified in the grand jury in support of this indictment, repeating the false story they had manufactured.

53.    As a result of his arrest and imprisonment for this case, Hooper lost his job.

### The Trial Proceedings

54.    Plaintiff's trial commenced with jury selection on January 26, 2016, in the Supreme Court, New York County.

55.    Assistant District Attorney Justin Ashenfelter was the assigned prosecutor.

56.    Before trial, ADA Ashenfelter provided Hooper's defense counsel with the names and index numbers of seven civil rights lawsuits that had been filed against the People's expected police witnesses.[1]

57.    The lawsuits had been filed in the United States District Court, Southern District of New York, and United States District Court, Eastern District of New York.

---

[1] One of the seven lawsuits ADA Ashenfelter disclosed, *Hodges v. City of New York*, 05-cv-2742 (E.D.N.Y. June 8, 2005), appears to name as a defendant a different "Robert Reed" than the one involved in Hooper's arrest.

58.    ADA Ashenfelter identified D'Ambrosio as a defendant in two lawsuits, Mejia as a defendant in two lawsuits, Reed as a defendant in two lawsuits,[2] and Vanweddinger as a defendant in one lawsuit.

59.    In the same pretrial disclosure, ADA Ashenfelter also disclosed that, in 2011, Vanweddinger was the subject of an IAB disciplinary action in which he was docked ten vacation days after a finding that he requested that a fellow officer improperly dispose of a traffic summons given to his friend.

60.    ADA Ashenfelter did not disclose any additional lawsuits, disciplinary actions, or misconduct complaints against any of the expected police witnesses.

61.    Mejia and D'Ambrosio testified at a suppression hearing and then again at trial.

62.    UC 313, Reed, and Smith also testified at trial.

63.    On each occasion, Mejia, D'Ambrosio, and UC 313 testified concerning the fabricated evidence they had provided the District Attorney's Office to cause Plaintiff's arrest and prosecution.

64.    Knowing of only the handful of civil lawsuits that had been disclosed, Plaintiff's criminal defense counsel decided not to cross-examine the officers about their alleged involvement in misconduct relating to their honesty and credibility.

65.    On February 2, 2016, the jury found Hooper guilty on all counts.

**Sentencing, Prison, and Reentry**

66.    At sentencing on March 31, 2016, the court sentenced Hooper to a term of six years in prison plus three years of post-release supervision.

---

[2] Only one of the two lawsuits appears to involve the correct Detective Robert Reed.  *See supra* n.1.

67.    Hooper spent approximately six years in custody, at which point he was released on post-release supervision.

68.    Hooper then spent four months under post-release supervision.

69.    During this time, he had to report to his parole officer, strictly observe a 9 p.m. curfew, expect the search of his home at any time, refrain from traveling outside of New York State without permission, and attend a substance abuse program.

**The 440 Motion**

70.    In March 2022, Hooper's assigned appellate counsel, the Center for Appellate Litigation (CAL), moved under New York Criminal Procedure Law § 440.10 to vacate Hooper's conviction.

71.    The basis for this motion was that, at the time of the trial, the prosecution, in violation of Hooper's constitutional right to disclosure of evidence favorable to the defense under *Brady v. Maryland*, 373 U.S. 83 (1963), had disclosed only seven of 14 civil lawsuits and one of 15 substantiated CCRB and IAB findings that CAL discovered had been filed against members of the team of narcotics officers who arrested Hooper.

72.    On November 22, 2022, the Office of the Special Narcotics Prosecutor withdrew its opposition to CAL's 440 motion and recommended to the court that the case be dismissed.

73.    On December 6, 2022, the Honorable Ruth Pickholz, Justice of the Supreme Court, New York County, granted Hooper's motion, vacated his conviction, and dismissed the case.

**Damages and Injuries**

74.    Plaintiff's injuries and damages include, but are not limited to, his:

a. Wrongful prosecution and conviction on false allegations of criminal sale of a controlled substance, criminal possession of a controlled substance, tampering with physical evidence, and resisting arrest;

b. Loss of or restrictions on his liberty including six years of incarceration followed by four months of post-release supervision;

c. Loss of the services, society, companionship, and consortium of his family and friends;

d. Past and future mental and emotional suffering; and

e. Past and future loss or diminution of employment earnings, in an amount to be determined by an economic expert.

## <u>FIRST CAUSE OF ACTION</u>

**42 U.S.C. § 1983; Denial of Liberty, Due Process, and a Fair Trial Under the Fourth, Fifth, Sixth, and Fourteenth Amendments Due to the Fabrication of False or Misleading Evidence by the Individual Defendants**

75.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 74 of this Complaint.

76.    The individual defendants, acting individually, acting in concert, and/or aiding and abetting one another, deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, manufactured false evidence against Plaintiff and caused such false allegations to be documented in police reports and other police paperwork and in a sworn Criminal Court complaint.

77.    The false evidence was material to Plaintiff's prosecution for criminal sale of a controlled substance, criminal possession of a controlled substance, tampering with physical

evidence, and resisting arrest in that it was the only evidence of guilt and it was reasonably likely to influence a jury to convict Hooper.

78.     The individual defendants forwarded, caused to be forwarded, or aided and abetted the forwarding of this false evidence to the Office of the Special Narcotics Prosecutor.

79.     The individual defendants knew that the evidence they had manufactured was likely to influence the decision by prosecutors whether to prosecute Hooper, the decision by the court concerning whether and on what conditions to release him on bail, the decision by the grand jury whether to indict him, and the decision by a trial jury whether to convict him.

80.     In fact, the fabricated evidence was a substantial and proximate cause of Plaintiff's deprivation of liberty and other injuries, including but not limited to his prosecution, detention, indictment, conviction, imprisonment in state prison, and time on post-release supervision.

81.     The prosecution was terminated in Plaintiff's favor.

82.      The individual defendants are therefore liable to Hooper, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that their unlawful conduct caused and for Plaintiff's attorneys' fees, costs, and expenses.

## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983; Malicious Prosecution Under the Fourth, Fifth, and Fourteenth Amendments by the Individual Defendants**

83.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 82 of this Complaint.

84.     The individual defendants, acting individually, acting in concert, and/or aiding and abetting one another, knowingly, willfully and with actual malice initiated, or caused the initiation and continuation of, Hooper's criminal prosecution, without probable cause.

85.     They caused Hooper to be deprived of his liberty.

86.     The prosecution was terminated in Hooper's favor.

87.     The individual defendants' conduct was outrageous and shocking to the conscience.

88.     Their conduct was a substantial and proximate cause of the deprivation of Plaintiff's right to be free of unreasonable search and seizure under the Fourth and Fourteenth Amendments to the United States Constitution, as well as his right to substantive and procedural due process under the Fifth and Fourteenth Amendments.

89.     The individual defendants are therefore liable to Hooper, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that their unlawful conduct caused and for Plaintiff's attorneys' fees, costs, and expenses.

### **THIRD CAUSE OF ACTION**

**Malicious Prosecution Under New York City Administrative Code § 8-803 by All Defendants**

90.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 89 of this Complaint.

91.     The individual defendants and their employer, the City of New York, are liable for their violation of Plaintiff's rights pursuant to § 8-802 of the New York City Administrative Code.

## FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments ("*Brady* Claim") by Mejia, D'Ambrosio, Reed, and Smith**

92.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 91 of this Complaint.

93.     Under New York law, the defense in a criminal case may cross-examine police officers about the specific allegations contained in unrelated civil lawsuits and CCRB or IAB misconduct complaints in order to impeach their general credibility, demonstrate their dishonesty and disrespect for the law, or show a pattern of similar behavior.

94.     Allegations that the police officers involved in this case had previously been accused of dishonest, abusive, or other illegal behavior would have assisted Hooper and his attorney in impeaching their credibility and thus was favorable to the defense under *Brady.*

95.     The officer-defendants who testified at Hooper's trial—Mejia, D'Ambrosio, Reed, and Smith ("the *Brady* defendants")—had a constitutional duty to inform the prosecution of information known to them that was favorable to a criminal defendant under *Brady* and potentially material to the outcome of the trial so that the prosecutor could disclose such information to the defense.

96.     This obligation included the civil lawsuits and CCRB or IAB misconduct complaints against them.

97.     Mejia failed to disclose at least the following two lawsuits to ADA Ashenfelter:

    a.     *Espinal v. City of New York*, 150090/120 (N.Y. Sup. Ct.), alleging that Mejia and other officers physically assaulted and verbally abused the plaintiff.

      b.  *Howard v. City of New York*, 113452/2010 (N.Y. Sup. Ct.), alleging that Mejia and other officers falsely arrested and imprisoned the plaintiff and improperly pressured him to withdraw a criminal complaint against a civilian who had assaulted him.

98.    Mejia also failed to disclose that, on January 8, 2016, over two weeks before Hooper's trial, the CCRB *substantiated* allegations that, on August 17, 2015, Mejia stopped an individual on the street without lawful cause, unlawfully searched him, and handcuffed him excessively tightly, fracturing his wrist.

99.    Disclosure of the substantiated allegations was also essential because an additional officer involved in the arrest of Hooper, Detective Knight, committed this misconduct with Mejia.

100.    Mejia also failed to disclose various additional CCRB allegations of misconduct against him that, while the CCRB had not substantiated them, would have provided a basis for potentially effective cross-examination.

101.    D'Ambrosio failed to disclose at least the following five lawsuits to ADA Ashenfelter:

      a.  *Cerda v. City of New York*, 155356-2014 (N.Y. Sup. Ct.), in which the plaintiff alleged that D'Ambrosio was part of a group of officers who falsely arrested plaintiff in his home in front of his children, ignoring his protestations that the officers were mistaking him for someone else, and falsely imprisoned him for 20 days.

      b.  *Alvarez v. City of New York*, 159562/2014 (N.Y. Sup. Ct.), in which the complaint alleged that D'Ambrosio was part of a group of officers who broke

into the plaintiff's apartment and bedroom at 6:00 a.m. without a proper

search warrant, unlawfully searched him, ransacked his apartment, and

unlawfully arrested him.

c. *Quezada v. City of New York*, 161825/2015 (N.Y. Sup. Ct.), in which the

complaint alleged that D'Ambrosio was part of a group of officers from the

Manhattan North Narcotics Bureau who unlawfully restrained, assaulted,

arrested, and imprisoned the plaintiff without probable cause.

d. *Amaro v. City of New York*, 402045/2012 (N.Y. Sup. Ct.), in which the

complaint alleged that D'Ambrosio was part of a group of officers who

unlawfully searched and arrested the plaintiff in his apartment without

probable cause and strip and cavity searched him.

e. *Christopher Rose v. City of New York, et al.*, 022529/2006 (Bronx Cty. Sup.

Ct.), in which the complaint alleged that D'Ambrosio falsely arrested the

plaintiff for drug possession, causing him to be unlawfully detained in jail for

one day, and prepared a false criminal complaint.

102.    D'Ambrosio also failed to disclose to ADA Ashenfelter various CCRB allegations

against him of misconduct which, while the CCRB had not substantiated them, would have

provided a basis for potentially effective cross-examination.

103.    Reed failed to disclose at least the following two lawsuits to ADA Ashenfelter:

a. *Fraser v. City of New York*, 1644/2009 (Sup. Ct. Kings Cty.), in which the

complaint alleged that Reed and another officer falsely arrested and assaulted

Amy Fraser and Kurt Fraser, including unlawfully tasing Kurt Fraser.

      b.   *McFarlane v. City of New York*, 10-cv-5314 (E.D.N.Y.), in which the

          complaint alleged that Reed harassed and assaulted the plaintiff, that Reed and

          another officer falsely arrested the plaintiff, and that Reed and another officer

          provided false or misleading information to prosecutors.

104.    Reed failed to disclose to ADA Ashenfelter that, in 2006, the CCRB substantiated an allegation that Reed used unauthorized force by employing his night stick as a club.

105.    Reed failed to disclose to ADA Ashenfelter additional CCRB allegations accusing him of misconduct which, while not substantiated by the CCRB, would have provided a potentially effective basis for cross-examination.

106.    Smith failed to disclose to ADA Ashenfelter that, in *Varlack v. City of New York*, 13-cv-116 (E.D.N.Y.), he was alleged to have assaulted a female suspect, falsely arrested and imprisoned her, and provided false or misleading information about her to prosecutors.

107.    Smith also failed to disclose to ADA Ashenfelter additional CCRB allegations accusing him of misconduct which, while not substantiated by the CCRB, would have provided a potentially effective basis for cross-examination.

108.    The aforementioned information the *Brady* defendants failed to disclose was material to the outcome of the trial because, had such information been timely disclosed, defense counsel could have used the information to cross-examine the officers and to discredit them.

109.    As a result of the *Brady* defendants' failure to disclose the aforementioned information to ADA Ashenfelter, he failed to disclose it to the defense despite his obligation to do so under *Brady*.

110.    There is a reasonable probability that, but for the *Brady* defendants' failure to disclose the aforementioned information to the prosecutor, Plaintiff would have achieved a more favorable outcome to the trial.

111.    The *Brady* defendants' failure to disclose the aforementioned information was a substantial and proximate cause of Plaintiff's injuries, including his conviction, incarceration in state prison, and time on post-release supervision.

112.    The *Brady* defendants failed to disclose the aforementioned information to the prosecutor knowingly, willfully, intentionally, recklessly, negligently, or with deliberate indifference to their obligation to do so.

113.    The *Brady* defendants are therefore liable to Hooper, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that their unlawful conduct caused and for Plaintiff's attorneys' fees, costs, and expenses.

### FIFTH CAUSE OF ACTION

**Monell/42 U.S.C. § 1983 Claim Against Defendant City of New York for *Brady* Violations by the NYPD**

114.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 113 of this Complaint.

115.    At all relevant times, the Police Commissioner, detectives, and other police officers employed by the NYPD were agents and employees of the Defendant City.

116.    Under the principles of municipal liability for federal civil rights violations, the Police Commissioner (or his authorized delegates), during all times relevant to this Complaint, had final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the constitutional requirements governing the disclosure of *Brady* material and

for adopting procedures or protocols that would ensure disclosure of such information to prosecutors.

117.    The Police Commissioner, personally and/or through his authorized delegates, constitutes a City policymaker for whom the City is liable with respect to compliance by the NYPD and its employees with their *Brady* obligations.

118.    During all times material to this Complaint, the Police Commissioner and/or his delegees owed a duty to the public at large and to Plaintiff, which they knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by their subordinates violating the due process and fair trial rights of criminal defendants and of other members of the public.

119.    They failed to do so even though they knew, or should have known:

(a)    that whether to disclose impeachment evidence favorable to a criminal defendant, including civil lawsuits and CCRB and IAB complaints against police witnesses, is a question that regularly arises during criminal prosecutions;

(b)    that such issues frequently present NYPD employees with the kind of difficult or non-obvious choice that instruction, training, supervision, and discipline would make less difficult;

(c)    that NYPD employees facing such issues have strong incentives to make the wrong choice;

(d)     that the wrong choice by NYPD employees will frequently cause the deprivation of the constitutional rights of criminal defendants and cause them constitutional injury; and

(e)     that NYPD employees had a history of making wrong choices in such matters.

120.    Prior to Plaintiff's trial, policymaking officials of the NYPD, due to their deliberate indifference to the *Brady* rights of criminal defendants, failed to implement reasonably adequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the duty of police officers to make timely disclosure to prosecutors of material evidence or information favorable to criminal defendants, including evidence or information impeaching the credibility of the police officers themselves.

121.    This disclosure was necessary so that prosecutors could determine whether to provide such information to criminal defendants and their counsel under *Brady* and its progeny.

122.    In addition, policymaking officials knew narcotics officers went out regularly as a team.

123.    A common tactic for a defense lawyer to defend a case is to attack the integrity of an investigation by such a team.

124.     A history of members of a team committing dishonest behavior would allow a defense attorney to question the integrity of the investigation, arrest, and conviction of his client and to thereby show reasonable doubt of guilt.

125.    When members of a team repeatedly engage in falsifying evidence, mistreating witnesses or suspects, covering up such mistreatment, exaggerating or manufacturing probable

cause, or other misconduct relating to their integrity, a defense attorney can use such information to cast doubt about the reliability of evidence the same officers claim to have turned up.

126.    Policymaking officials at the NYPD knew that members of the force often acted as essential witnesses in criminal prosecutions and that many of them face, or have faced, lawsuits and CCRB or IAB complaints alleging they engaged in various types of misconduct, including fabricating evidence, stealing, other acts of dishonesty, physically or verbally abusing suspects, and making arrests without probable cause.

127.    Even though the content of such civil lawsuit allegations and CCRB or IAB complaints may have a crucial bearing on the credibility of such police witnesses or on the integrity of a police investigation, at the time of Hooper's trial in January and February 2016, the NYPD had adopted no policy, practice, or procedure requiring such police witnesses to provide such civil lawsuit or CCRB or IAB information to District Attorneys or Assistant District Attorneys.

128.    Instead, the NYPD had an unlawful policy, implemented in trainings given to officers at the Police Academy and in police training materials, of narrowly defining *Brady* material as "exculpatory evidence that tends to clear someone's guilt."

129.    This policy was unlawful because, under the United States Constitution, police officers also have an obligation to disclose *impeachment* material, such as an officer's prior lawsuit and CCRB and IAB complaints, to prosecutors so that they in turn may disclose it to the defense.

130.    Prior to Plaintiff's trial, and consistent with the NYPD's unlawful policy, the NYPD failed to train or instruct members of service concerning their constitutional obligation to disclose evidence potentially impeaching their credibility as prosecution witnesses.

131.    Although the issue of whether to disclose various forms of impeachment material to prosecutors (including civil lawsuit information and CCRB and IAB complaints) regularly arises during criminal prosecutions, prior to Hooper's trial, NYPD policymaking officials issued no Patrol Guide provision or other written directive to officers concerning when, if at all, to disclose such impeachment information to prosecutors.

132.    The training on *Brady* given to NYPD recruits did not mention that they had a duty to disclose impeachment material to prosecutors at all.

133.    The NYPD had a comprehensive database of civil lawsuits against its officers.

134.    It had a comprehensive database as well of IAB and CCRB complaints against such officers.

135.    It could have used these databases to provide potential impeachment information concerning the officers involved in an arrest directly to prosecutors handling criminal cases resulting from NYPD arrests.

136.    Alternatively, the NYPD could have required each police officer to obtain the information contained in its databases about his own misconduct history and to provide it to the prosecutor in each case where the officer was involved in an arrest or was a potential witness.

137.    Nevertheless, NYPD policymakers made a conscious decision not to instruct officers to obtain information from the databases, or to disclose the content of the databases to DA's Offices directly, despite knowing that this training omission would make *Brady* violations far more likely to occur.

138.    Moreover, at all times relevant to this case, the NYPD failed to discipline members of service for failing to provide *Brady* material, including impeachment evidence

and/or civil lawsuit information or CCRB or IAB complaints, to prosecutors, which also revealed a policy of deliberate indifference to such violations.

139.    On March 14, 2011, Carlton Wigfall was convicted after trial of Criminal Sale of a Controlled Substance in the Third Degree.

140.    On February 3, 2015, a New York Supreme Court judge granted Wigfall's CPL 440.10 motion to vacate his conviction, finding that the People failed to disclose the existence of several federal civil lawsuits alleging false arrest brought against the People's main witness at trial.

141.    The officer witness, who had been working as a member of a Street Narcotics Enforcement Unit, was the only person who purportedly observed Wigfall participate in a narcotics sale on West 113th Street between St. Nicholas and Seventh Avenues.

142.    The officer had failed to disclose his own civil lawsuit history to the prosecutor.

143.    On March 2, 2015, Jeremiah Spruill was convicted after trial of Criminal Sale of a Controlled Substance in the Third Degree.

144.    On January 8, 2018, a New York Supreme Court judge granted Spruill's CPL 440.10 motion to vacate his conviction based on the prosecution's failure to disclose numerous federal civil rights lawsuits against the undercover officer, including one lawsuit where the jury found the undercover had fabricated evidence.

145.    The undercover officer's trial testimony was the primary basis for Spruill's conviction for a purported drug sale in West Harlem.

146.    The undercover officer had failed to disclose his own civil lawsuit history to the prosecutor.

147.    On October 15, 2015, Raymond Teran was convicted of Criminal Sale of a Controlled Substance in the Third Degree and other counts.

148.    On January 27, 2016, a New York Supreme Court judge found that the prosecution had failed to disclose favorable evidence in the form of multiple civil lawsuits against the undercover officer who testified to Teran's involvement in drug sales in East Harlem.

149.    The undercover officer had failed to disclose his own civil lawsuit history to the prosecutor.

150.    On March 30, 2016, Gary Harris was convicted after trial of Criminal Sale of a Controlled Substance in the Third Degree.

151.    On October 2, 2018, a New York Supreme Court judge granted Harris's CPL 440.10 motion to vacate his conviction, finding that the People failed to disclose the existence of multiple federal civil lawsuits against a narcotics officer.

152.    The officer had failed to disclose his own civil lawsuit history to the prosecutor.

153.    On February 22, 2017, Titus McBride was convicted after trial on several counts of burglary.

154.    On October 28, 2022, a New York Supreme Court judge granted McBride's CPL 440.10 motion to vacate his conviction based on the prosecution's failure to disclose numerous civil lawsuits alleging false arrest, unlawful stops, frisks, and strip searches, and excessive force, as well as an IAB investigation and suspension for soliciting prostitutes while on duty, against the officers who performed most of the investigative work leading to McBride's arrest and provided the majority of testimony against him at trial.

155.    The officers had failed to disclose the aforementioned impeachment information to the prosecutor.

156.    On November 28, 2016, Frederick White was convicted after trial for Murder in the Second Degree.

157.    On June 12, 2024, a Bronx County Supreme Court judge granted White's CPL 440.10 motion to vacate his conviction, finding that the prosecution violated *Brady* by withholding civil lawsuits alleging fabricated confessions and CCRB complaints alleging additional misconduct against the officer who testified at trial that White confessed.

158.    The officer had failed to disclose his own civil lawsuit and CCRB history to the prosecutor.

159.    On December 6, 2019, a New York State Supreme Court justice granted Jawaun Fraser's CPL 440.10 motion on the basis of the prosecution's failure to disclose numerous lawsuits brought against members of an undercover narcotics team.

160.    This failure had resulted, in whole or in part, from the failure of the officers to disclose their own lawsuit histories to the prosecutor and the failure of the NYPD, which had such information in a database, to disclose such information directly to the prosecutor or to require the officers to do so.

161.    Fraser had been convicted at trial on November 24, 2015, two months before Hooper was convicted.

162.    On March 21, 2023, a jury in *Jawaun Fraser v. City of New York*, 20-cv-4926 (S.D.N.Y.), found the City of New York liable for a policy, practice, and/or custom that was a substantial cause of the withholding of *Brady* material at Fraser's trial.

163.    At trial in his section 1983 civil rights case, Fraser presented evidence that the NYPD commissioner and other policymaking officials were deliberately indifferent leading up to Fraser's criminal trial about whether officers complied with their *Brady* obligations.

164.    Based on evidence introduced at trial, Fraser argued that from 1963 until 2014 the NYPD had no written *Brady* disclosure policy and no mention of *Brady* in any training materials given to officers.

165.    Fraser also produced evidence showing that the NYPD limited its definition of *Brady* in its policy and training materials to exculpatory information indicative of innocence, omitting any reference to impeachment material.

166.    Fraser showed that the NYPD did not change its unlawful written policy until January 2017.

167.    Fraser produced evidence showing that the NYPD had a comprehensive database of civil lawsuits against its officers.

168.    Fraser showed that the NYPD could have used this database to inform every testifying officer in every case of his civil lawsuit history, or shared the contents directly with prosecutors, but it elected not to do so knowing that *Brady* violations were almost certain to occur.

169.    Fraser also presented evidence proving that no officer has ever been disciplined for failing to disclose civil lawsuit information to the prosecution.

170.    Fraser showed that the NYPD maintained its lax approach to *Brady* compliance despite knowing that officers had a history of perjury and that the withholding of impeachment information was a leading cause of wrongful convictions.

171.    The jury found the City of New York liable for the NYPD's unlawful policy, practice, and/or custom of suppressing impeachment material, including civil lawsuit information, and awarded Fraser $1.5 million in compensatory damages against the City.

172.    It also awarded $425,000 in punitive damages against the individual officer defendants.

173.    Upon information and belief, even after the jury in *Fraser v. City of New York*, 20-cv-4926 (S.D.N.Y.), found that defendant UC 84 had fabricated evidence against Fraser and withheld *Brady* material, causing him to be wrongfully convicted of robbery and incarcerated for two years, the NYPD continued to deploy UC 84 in the field to make undercover buys and arrests.

174.    The NYPD has not investigated or disciplined any of the officers in the aforementioned cases for failing to disclose impeachment information even though the court decisions and evidence showed they had failed their duty to disclose such information.

175.    In addition to failing to disclose the civil lawsuits and CCRB and IAB complaints against police witnesses who testified at Hooper's trial, the individual defendants and the NYPD failed to disclose to Hooper's prosecutor the civil lawsuit and disciplinary history of other members of the team that arrested Hooper.

176.    Vanweddinger failed to disclose at least the following five lawsuits to ADA Ashenfelter:

a.    *Flores, et al. v. City of New York*, 260604/2010 (Bronx Sup. Ct.), in which the plaintiff alleged that Vanweddinger and other officers falsely arrested plaintiffs; used excessive force on them, causing severe and permanent injuries; and unlawfully imprisoned them.

b.    *Soto, et al. v. City of New York*, 309161/2011 (Bronx Sup. Ct.), in which the plaintiffs alleged that Vanweddinger and another officer falsely arrested and

imprisoned a 16-year-old and prevented him from contacting his mother while in custody.

c. *Harris v. City of New York*, 13-cv-8126 (S.D.N.Y.), in which the plaintiff alleged that Vanweddinger and another officer assaulted and falsely arrested him and provided false or misleading information to prosecutors.

d. *Flowers v. City of New York*, 301373/2015 (Bronx Sup. Ct.), in which the plaintiff alleged that Vanweddinger and another officer falsely arrested him, caused the filing of a false criminal complaint, and caused a wrongful prosecution for two years before all charges were dismissed.

e. *Michelle Pomales v. City of New York, et al.*, 155352/2016 (New York Sup. Ct.), in which Vanweddinger and another officer were accused of unlawfully stopping and searching the plaintiff and falsely arresting her. Vanweddinger and the other officer were further accused of handcuffing the plaintiff excessively tightly and refusing to adjust the handcuffs despite her complaints of pain, causing severe damage to her wrists, as well as unlawfully detaining her and preparing a false criminal complaint. Notice of claim was filed on June 22, 2015, prior to Hooper's criminal trial.

177. In addition, Vanweddinger did not disclose to the prosecution that he had been found guilty of at least five CCRB allegations for two separate incidents.

178. In the first incident, in 1999, the CCRB substantiated allegations that Vanweddinger abused his authority and employed unauthorized use of force by pushing or shoving a civilian.

179.    In the second incident, in 2014, the CCRB substantiated allegations that Vanweddinger abused his authority by stopping a vehicle without lawful cause, unlawfully threatened to damage or seize property, and used discourteous language.

180.    Vanweddinger also failed to disclose to ADA Ashenfelter additional CCRB allegations accusing him of misconduct which were not substantiated but which potentially related to his credibility.

181.    Knight failed to disclose at least the following four lawsuits, as well as the underlying misconduct, to ADA Ashenfelter:

a. *Dudley. v. Knight*, 12-cv-5148 (S.D.N.Y.), in which the plaintiff alleged that Knight and other officers falsely arrested him and provided false or misleading information to prosecutors.

b. *Deborah Graham v. City of New York*, 13-cv-5173 (S.D.N.Y.), in which the plaintiff alleged that Knight and other officers unlawfully entered and searched the plaintiffs' home, unlawfully detained them, assaulted them, and caused the infant plaintiffs to fear physical injury.

c. *Solomon v. City of New York*, 16-cv-1576 (S.D.N.Y.), in which the plaintiff alleged that Knight and another officer falsely arrested the plaintiff after planting drugs on him.

d. *Outerbridge v. City of New York*, 11-cv-3843 (S.D.N.Y.), in which the plaintiff alleged that Knight and other officers assaulted and falsely arrested him after he told an undercover officer trying to purchase drugs to leave him alone.

182.    Knight knew that he had been found guilty of at least four CCRB charges for two separate incidents but did not disclose any of them to ADA Ashenfelter.

183.    In the first incident, in 2013, the CCRB substantiated an allegation that Knight abused his authority by refusing to obtain medical attention for a civilian.

184.    In the second incident, on January 8, 2016, over two weeks before Hooper's trial, the CCRB substantiated allegations that, on August 17, 2015, Mejia and Knight stopped an individual on the street, improperly threatened to assault and arrest him, unlawfully searched him, and handcuffed him unduly tightly, fracturing his wrist.

185.    Knight failed to disclose to ADA Ashenfelter additional CCRB allegations accusing him of misconduct which were not substantiated but which potentially related to his credibility.

186.    As a result of the NYPD's inadequate training, supervisory and disciplinary policies and practices, the individual defendants and the NYPD failed to disclose to prosecutors in Plaintiff's case, as required by *Brady*, the aforementioned civil lawsuits and CCRB and IAB complaints accusing the individual defendants of fabricating evidence and other illegal, dishonest, or immoral activities, and this was a substantial cause of the prosecutor's failure to fully disclose such information to the defense and of Plaintiff's conviction and resultant injuries.

187.    The aforementioned *Brady* violations in this case were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are prosecuted for alleged criminal activities on the basis of investigations and arrests by the New York City Police Department, and/or stemming from the NYPD's unlawful policy of not requiring officers to disclose impeachment information.

188.    By virtue of the foregoing, Defendant City is liable to Plaintiff under 42 U.S.C.

§§ 1983 and 1988, for the violation of his constitutional rights and for all his consequential

injuries and damages.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.  For compensatory damages of not less than $18 million;

b.  For punitive damages of not less than $12 million;

c.  For reasonable attorneys' fees, together with costs and disbursements,

pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

d.  For pre-judgment interest as allowed by law; and

e.  For such other and further relief as this Court may deem just and proper.

Law Offices of Joel B. Rudin, P.C.

_____/s/_____

By:     Joel B. Rudin
        David E. Rudin
        Law Offices of Joel B. Rudin, P.C.
        152 West 57th Street, 8th Floor
        New York, New York 10019
        (212) 752-7600
        jbrudin@rudinlaw.com

        *Attorneys for the Plaintiff*

Dated: New York, New York
        December 18, 2024